UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SCOTT LEWIS DELK,

        Plaintiff,

v.                                                    No. 2:14-CV-505

CAROLYN W. COLVIN,
Acting Commissioner,
Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Scott Lewis Delk ("Delk") brought this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Commissioner of the Social Security Administration's ("Commissioner") decision denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act. Specifically, Delk challenges two aspects of the Commissioner's decision. He argues that the ALJ's RFC finding was not supported by substantial evidence and that the ALJ relied on insufficient vocational testimony. (ECF No. 9, at 3). The matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72 for recommended disposition. After review of the complete record, the undersigned concludes that substantial

1

evidence supports the ALJ's finding that absent Delk's substance abuse, he would not be disabled. The undersigned also finds that the ALJ properly relied on the testimony of the vocational expert. Accordingly, for the reasons stated in detail below, the undersigned recommends that the Court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 10), DENY Delk's Motion for Summary Judgment (ECF No. 8), and AFFIRM the final decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

On November 15, 2011, Delk filed an application for Disability Insurance Benefits ("DIB") alleging a disabling condition as of May 12, 2006. R. at 153.[1] The application was amended that same day to allege that the disabling condition began on May 12, 2007 rather than 2006. R. at 155.[2] On November 15, 2011, Delk also filed an application for Supplemental Security Income ("SSI") alleging that the disabling condition began on May 12, 2006. R. at 157. The DIB and SSI applications were denied both initially and on reconsideration. R. at 101-06, 111-24. Delk requested an administrative hearing, which was conducted on June 19, 2013. R. at 27-52, 125, 133-48.

On July 22, 2013, Administrative Law Judge O. Price Dodson

---

[1] Record citations are to the Administrative Record.
[2] It appears from the Record that the ALJ made his decision based on evidence that included information from 2006, see R. at 20, and Delk asserts the 2006 date in his Memorandum in Support of Summary Judgment, (ECF No. 8, at 2).

("ALJ") found that Delk was not disabled under the Social Security Act and denied the DIB and SSI claims. R. at 24. The Appeals Council denied Delk's request for review and the ALJ's decision became the final decision of the Commissioner on August 15, 2014. R. at 1.

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Delk timely filed this action seeking judicial review of the Commissioner's final decision. (ECF No. 1). The matter comes before this Court on cross-motions for Summary Judgment.

## II. FACTUAL BACKGROUND[3]

Delk was born in 1968 and was at least thirty-seven years old at the onset of the alleged disability. R. at 22, 153, 157. He has received at least high school level education and "went through a couple of years" of college. R. at 33, 294, 323, 421. Prior to May 12, 2006, Delk had worked as a delivery driver for United Parcel Service ("UPS"). R. at 13, 36. Delk had been employed with UPS since February of 1988, but was let go in May of 2006.[4] Delk has offered varying reasons for his termination, but most consistently, he was terminated for failure to complete

---

[3] Though Delk has physical ailments and limitations, he does not contest the ALJ's finding with respect to the limits imposed by his physical impairments. Therefore, the undersigned's analysis will be limited to Delk's mental impairments and substance abuse.

[4] As the Commissioner references, the Record indicates Delk may have worked for UPS until 2008. See R. at 294, 302, 362. Furthermore, medical records from 2006 and 2007 reference Delk's need for Doctor's notes to present to his employer. See R. at 228, 230.

tasks without assistance; and the termination was likely prompted by a DUI conviction. R. at 16, 18, 36-37, 357, 415. Since then, Delk has had other employment, which lasted for shorter periods of time. See R. at 20, 31, 35-36, 233 (noting past work at a golf course and as a salesman).

Delk lives alone. R. at 34. On a typical day, he rises early to go for a walk, prepares his own meals, telephones his family, and spends the rest of his time either sleeping or watching television. R. at 38. Delk has a driver's license and goes out once a week for appointments and errands. R. at 33-34. Due to social anxiety, he goes grocery shopping either late at night or early in the morning. R. at 38, 40. Despite his difficulty socializing with others, Delk attends a weekly diabetes education class. R. at 14, 38-39.

At his hearing, Delk testified that he suffers from social anxiety, depression, heart issues, and limitations due to a colostomy. R. at 40, 42-44. In light of the Record, he admitted at the time of the hearing that he was capable of consuming "a fifth of alcohol over the course of a night," which occurred once or twice a month. R. at 45. Delk stated that he lost his job as a UPS delivery driver due to an inability to focus and to complete the job without assistance from others. R. at 37.

Delk's medical records show extensive treatment for his physical ailments and numerous references to his substance abuse

4

disorder. His earliest mental health issue is a self-reported diagnosis of ADHD as a child. R. at 293.

The first adult reference to mental health issues occurs in January of 2008 when Delk visited his primary care physician, Dr. Craig B. Froede. See R. at 241. Dr. Froede indicated that Delk suffered from an anxiety and panic disorder and that he needed counseling. R. at 241. Delk mentioned having anxiety and panic attacks previously, but noted he had been able to talk himself through the attacks. Id. Although Dr. Froede referred Delk to a psychiatrist, Delk reported to have never been on medication for panic attacks. Id. At that time, Delk was in a relationship and had also made a recent trip to North Carolina. Id. Other records indicate Delk experienced symptoms of diverticulitis as well as alcohol withdrawal during November of 2008. R. at 249, 256.

Despite his physical ailments, Delk was still able to be active outdoors as indicated by his work at a golf course during 2009. R. at 20, 233. The records from September 2009 also reference Delk's history of heavy drinking, but he had apparently stopped drinking one month prior to the appointment. R. at 234.

In February of 2010, Delk returned to the doctor with health issues due to his non-compliance with blood pressure medicine. R. at 236. Records from this time also indicate Delk

frequently drank despite the doctor's recommendation for Delk to abstain or decrease his consumption of alcohol. R. at 236, 308. In a November follow-up appointment, he reported having alcohol related binges every two to three months. R. at 238.

In March of 2011, Delk presented to the hospital with heart palpitations, which occurred after consuming a few bloody marys. R. at 245. He reported consuming approximately six cans of beer and two shots of liquor per week. R. at 261, 283. He was advised to stop consuming alcohol. R. at 246. The hospital records indicate a plan for Delk to take anxiety medication. R. at 256, 260. The cardiologist, Dr. Mohit Bhasin, reported Delk felt symptoms of diaphoresis and anxiety, but noted Delk did not have chest pain or pressure. R. at 260-61. There was no other reference to anxiety in the doctor's report. See R. at 260-62. In response to this heart issue, Delk received a stress echocardiogram. See R. at 265-77. The test revealed Delk was negative for ischemia. R. at 265.

Delk's only other reported instance of anxiety that year came in a September visit to the emergency room after a physical altercation with his brother-in-law, when he was placed in a choke hold. R. at 313-17. Delk described chest pain and syncope[5], but his doctor noted that Delk was oriented to person, place,

---

[5] "Syncope" is a temporary loss of consciousness, or fainting.  Dorland's Illustrated Medical Dictionary, 1844, (31st ed. 2007).

and time. R. at 318. Delk also denied alcohol or illicit drug use at that time, but admitted to regular alcohol use "mainly on the weekends." (R. 317-18).

On January 12, 2012, Delk received a psychiatric evaluation from the Virginia Beach Department of Human Services with Drs. David A. Rosin and Abigail Dwiggins. R. at 293-300. In the evaluation, Delk reported being depressed all the time, which he said had been occurring for years. R. at 293. Delk also reported having suicidal thoughts all the time, but lacked any intent or plan to act on the thoughts. Id. Delk referenced a history of drug and alcohol abuse, but reported participating in Virginia's Alcohol Safety Action Program ("ASAP") at the time of the evaluation. R. at 293, 299. Delk's history of mental health noted that he "was seen by an outpatient provider in 2005-2006 for depression" and that another doctor had recently diagnosed Delk with bipolar disorder. R. at 293.[6] The psychiatrist observed Delk as "alert and oriented . . . with clear sensorium." R. at 294. Furthermore, she noted Delk's thought process was logical, linear, and goal-directed. Id. Delk was assessed as Major Depressive, noting his alcohol abuse and dependence. R. at 295. Listed first on the treatment plan from this visit was avoidance

---

[6] No record of these outpatient visits is in the Administrative Record.

of drugs and alcohol. Id. Delk was assessed with a GAF[7] score of 55 and also received a prescription for Zoloft. R. at 295, 298.

On January 19, 2012, Delk had a psychological evaluation at the Virginia Department of Rehabilitative Services by Richard Shea, Ph.D. R. at 301. Delk complained of depression, bipolar disorder, and ADHD. R. at 301. Shea reported that Delk had been diagnosed with depression in 2003 or 2004 due to lack of motivation, as well as a recent diagnosis of bipolar disorder. Id.[8] Delk reported that he isolated himself, cried, and prayed without improvement in his condition. Id. His counseling at the Community Service Board consisted of both individual and group sessions. Id. Shea also noted Delk's report of childhood ADHD symptoms as well as counseling sessions on and off throughout elementary school. R. at 301-02. Furthermore, Delk reported problems throughout his employment at UPS that included mistakes, missed deliveries, and requiring assistance to finish tasks. R. at 302. Delk reported his daily activities to include

---

[7] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

[8] No other record of the diagnosis is in the Administrative Record.

sleeping, crying, and getting up. Id. He avoided social interaction. Id. In the evaluation, Delk also denied abuse of alcohol, but he admitted to previous abuse. Id. Additionally, Shea evaluated Delk's trouble sleeping and suicidal ideation. R. at 303. Shea diagnosed Delk with major depressive disorder, generalized anxiety disorder, attention-deficit/hyperactivity disorder, and bipolar disorder. R. at 303. Shea assessed Delk with a GAF score of 55. R. at 304. Shea also reported that Delk's ability to work and perform at work would be contingent on the stabilization of his psychological condition with treatment. R. at 305.

On February 28, 2012, Delk had a medication management appointment with Dr. Dwiggins. R. at 350. He reported having trouble sleeping to the point he was delirious at times. Id. Delk also reported "falling off the wagon" and drinking for two to three days. Id. He tested positive to benzodiazepines on a urine drug screen test and admitted to taking medication not prescribed to him. Id. Dr. Dwiggins reported Delk's mood as depressed and once again listed avoidance of drugs and alcohol as number one element of the treatment plan. Id.

On March 11, 2012, Delk again visited the emergency room due to a syncope episode after playing golf with a friend. R. at 321. Delk was assessed as depressed but his "mood appear[ed] stable without exacerbation of depressive symptoms" and he was

continued on his medication. R. at 326-27. He later received a cardiac catheterization, an echocardiogram, and an electroencephalogram. R. at 329, 342, 345. There were no complications in the cardiac catheterization and the procedure was well tolerated. R. at 329. The echocardiogram revealed a mildly dilated left atrium but otherwise normal heart size and function. R. at 343. The electroencephalogram revealed no lateralized findings nor detected epileptiform abnormalities. R. at 345.

On admission to the hospital Delk reported former alcohol use of eight to ten drinks a day for ten years, but stated that was no longer an issue. He had not had a drink for a week at the time of the visit. R. at 323. In the same social history, Delk stated he "worked as a UPS driver for 20 years, but now mans the Kiln Creek Pro Shop. No disabilities." Id. His discharge diagnoses listed depression, but noted that he had remained stable when off of his medication during treatment. R. at 336, 339.[9] As part of his discharge, Delk was advised to avoid all alcohol. R. at 340.

In a medication management appointment with Dr. Dwiggins, on March 21, 2012, Delk reported his recent doctors' visits. R. at 352. He also denied using alcohol since before his February

---

[9] He was taken off of the mirtazapine while at the hospital due to the potential side effects. See R. at 339.

appointment with Dr. Dwiggins and indicated that he had been attending AA meetings. Id. Dr. Dwiggins reported Delk's mood as "sad." Id. Avoidance of drugs and alcohol was still listed first on Dr. Dwiggins' treatment plan for Delk. Id.

On May 1, 2012, Dr. Dwiggins reported Delk's hospitalization for reasons including the inability to care for himself. R. at 354. On that date, Delk was admitted on a temporary detention order to the Virginia Beach Psychiatric Center. R. at 414. He was admitted "due to depression with suicidal ideation, auditory hallucinations, inability to care for self, and alcohol dependence and intoxication." Id. Delk stated on admission that he drank a gallon of alcohol every two days. Id. He was admitted with a GAF score of 30 with an estimated stay of seven to ten days on a plan that included alcohol detoxification. R. at 416. On May 11, Delk was discharged and the discharge summary noted Delk had experienced alcohol withdrawal while at the hospital. Id. The summary also listed medications Delk was taking to resolve hallucinations and sleep issues. R. at 422. Furthermore, the summary noted Delk had been a vocal leader in group therapy as well as proactive in obtaining and maintaining his sobriety while at the hospital. Id. He was discharged with a GAF score of 60. R. at 422.

During a follow-up psychiatric evaluation on May 31, 2012 with Dr. Rudolph Freeman Jr., Delk reported relapsing and

"drinking massive amounts of alcohol." R. at 361. Delk attributed the relapse to an altercation with a co-worker/friend. R. at 360. Dr. Freeman noted that Delk was not receiving consistent follow-up treatment since his discharge from the psychiatric center. Id. Delk reported being depressed all the time, as well as having problems with anger and irritability. Id. Delk mentioned his substance abuse history and indicated his participation in ASAP. Id. Delk was not having suicidal thoughts at that time. R. at 361. He was given a GAF score of 40, and the avoidance of drugs and alcohol was once again listed at the top of his treatment plan. R. at 362, 364.

In March 2013, Delk had colostomy surgery. R. at 366. During a follow-up visit on March 19 with Doctor Semret T. Mebrahtu, Delk reported that he did "not drink alcohol." R. at 367; see also R. at 371, 374. Dr. Mebrahtu noted Delk's hypertension was elevated due to his anxiety, but improving, and that Delk was on medication for his anxiety and depression. R. at 368. Dr. Mebrahtu's notes indicate a plan for Delk to get an appointment with the psychiatry department and to monitor his blood pressure. R. at 372. However, Dr. Mebrahtu's evaluation also states Delk was negative for "anxiety, depression, irritability, or mood swings." R. at 379. Delk had another post operation follow-up in April. See R. at 435.

On May 7, 2013, Dr. Mebrahtu completed a check-the-box

"Medical Evaluation Report" of Delk based on the duration of his treatment beginning in March 2013. R. at 385-88. Dr. Mebrahtu listed anxiety and depression as one of Delk's impairments in addition to his diverticulitis. R. at 385. Dr. Mebrahtu evaluated Delk's fatigue as precluding fulltime work and attributed it to his anxiety and depression. R. at 385-86. Dr. Mebrahtu listed no evidence of limitation in Delk's mental capacities assessment in all categories including the ability to interact appropriately with the general public. R. at 387-88. Dr. Mebrahtu expected Delk's impairment to improve as long as his depression and anxiety improved. R. at 388.

On June 2, 2013, Delk entered the emergency department at Depaul Medical Center, with upper lip swelling. R. at 389. The doctor listed alcohol abuse and alcohol withdrawal in addition to Delk's medical problems of Supraventricular Tachycardia, Hyperlipidemia, Cardiac arrhythmia, hypertension, diabetes, and angioedema of lips. R. at 392-93. Delk was also seen by several cardiovascular specialists at that time. See R. at 396, 403, 409.

In February and May of 2012, Delk's records were reviewed by Drs. Thomas M. Phillips and Carolina Bacani-Longa, state agency physicians. R. at 53-64, 77-87. Delk communicated in both reports that he was alleging only mental disability, stating his physical impairments were not debilitating. R. at 56, 80. Both

doctors noted the limitations in Dr. Shea's opinion characterizing the consultive evaluation as an overestimate based only on a snapshot of Delk's functioning. R. at 62, 85.

Dr. Phillips factored substance abuse into the evaluation and determined Delk was not disabled. R. at 58, 63. Delk's condition resulted in some limitations, however they were not severe enough to keep him from working. R. at 63. Dr. Phillips noted Delk's treatment for depression and stated he would still be able to perform simple routine work, with minimal interaction with other people. Id.

Dr. Bacani-Longa also determined Delk was not disabled. R. at 86. She based her decision on the satisfactory results of a stress test and noted the stability of Delk's mental health with treatment. Id. She further noted his condition "should continue to improve with substance abuse treatment and sobriety." Id. In Dr. Barcani-Longa's determination Delk's impairments were not severe enough to keep him from working. Id.

During Delk's hearing on June 19, 2013, the ALJ questioned a vocational expert ("VE"). R. at 50. Specifically, the ALJ asked whether there were any jobs available for

> an individual who's 44 years of age, has a high school
> education and past work experience as described in the
> record . . . capable of light exertion . . . with
> additional limitations in that the individual should
> avoid unprotected heights or dangerous
> machinery. . . . [And the individual is also] limited
> to performing simple, repetitive tasks, and would need

to avoid occupations that would require close interaction with the general public.

R. at 50-51. The VE responded that such jobs exist in significant numbers in the national economy. R. at 51.

### III. STANDARD OF REVIEW

The final decision of the Commissioner is reviewed only for support by substantial evidence, and to assess whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

Under this standard of review, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996), superseded by regulation on other grounds 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hayes, 907 F.2d at 1456. The Court does

not determine whether the claimant is actually disabled, even when reasonable minds differ. Craig, 76 F.3d at 589. The responsibility for that determination falls to the Commissioner. Id.

When the Commissioner's findings of fact are supported by substantial evidence, the findings are conclusive and must be affirmed. Perales, 402 U.S. at 390. Therefore, reversing the Commissioner's denial of benefits is appropriate only if the ALJ's determination is not supported by substantial evidence, or if the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for DIB and SSI under the Social Security Act, 42 U.S.C. § 303 et seq., an individual must meet the insured status requirements of section 423(c)(1), be younger than retirement age, file an application for disability insurance benefits, and be under a "disability" as defined in the Act. 42 U.S.C. § 423 (a)(1).

The Social Security Administration defines "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(1)(A). An individual

who is disabled must have a "severe impairment" that makes it impossible to do previous work "or any other substantial gainful activity that exists in the national economy." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(2)(A).

The Commissioner of Social Security considers all material facts in determining whether a claimant has a disability. 42 U.S.C. § 423(d)(2)(B), by conducting a familiar five-step sequential analysis. 20 C.F.R. §§ 404.1520 (a)(4), 416.920 (a)(4). The five steps contain questions that must be answered by the ALJ:

1.  Does the individual participate in substantial gainful activity?

2.  Does the individual suffer from a severe impairment or combination of impairments, which(s) meet the duration requirement?

3.  Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R. § 404, Subpart P, App. 1?

4.  Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.  Does the individual's impairment or impairments prevent him or her from doing any other work?

See 20 C.F.R. §§ 404.1520 (a)(4), 416.920 (a)(4).

The answers to questions four and five are based on the assessment of the claimant's residual functional capacity (RFC). See 20 C.F.R. §§ 404.1520 (a)(4)(iv)-(v), 416.920 (a)(4)(iv)-(v). An affirmative answer to question one or a negative answer to questions two or four, result in a determination that the individual is not disabled. See 20 C.F.R. §§ 404.1520 (a)(4)(i)-(ii), (iv) and 416.920 (a)(4)(i)-(ii), (iv). Whereas, an affirmative answer to questions three or five establishes disability. See 20 C.F.R. §§ 404.1520 (a)(4)(iii), (v) and 416.920 (a)(4)(iii), (v).

The burden of proof lies with the claimant during steps one through four, but shifts to the Commissioner in step five. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

Throughout the analysis the ALJ considers the objective medical facts, the diagnoses or medical opinions based on those facts, the subjective evidence of disability, as well as the claimant's educational background, age, and work experience. Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008)(citing Monguer v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)). The ALJ bears the ultimate responsibility for weighing the evidence in his findings of fact. Hays, 907 F.2d at 1456.

Furthermore, since Delk's case involves substance abuse that contributed to his impairments, the ALJ must conduct

additional analysis to determine whether the claimant would still be disabled if he stopped using alcohol or drugs. See 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). The relevant inquiry is "whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability" when there is a finding of disability and a medical history of substance abuse. 20 C.F.R. § 404.1535(a); see also McGhee v. Barnhart, 366 F. Supp. 2d 379, 389 (W.D. Va. 2005) (citing Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001); Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)).

Thus, the ALJ first conducts the five-step inquiry accounting for all of the medical evidence. McGhee, 366 F. Supp. 2d at 389. The subsequent inquiry into whether the claimant would still be disabled absent the substance use occurs only if the ALJ determines that the claimant is disabled and there is medical evidence of substance abuse. Id.

A.    The ALJ's Decision

In evaluating Delk for DIB and SSI, the ALJ applied the five-step analysis. He found that: (1) Delk had not engaged in substantial gainful activity since May 12, 2006; (2) his severe

impairments included Depression, Anxiety, Alcohol Dependence, Tachycardia, Diverticulosis, Status Post Colostomy; (3) with or without his substance abuse he did not have an impairment or combination of impairments that met or equaled the listed impairments; (4) given his limitations, Delk had the residual functional capacity to perform light work, but must avoid unprotected heights and dangerous machinery and is limited to simple repetitive job tasks that do not require close interactions with the general public; his impairments also affected his capacity for maintaining concentration and attention, and precluded his past relevant work. And at step (5), the ALJ concluded that there are no jobs in significant numbers in the national economy that Delk can perform given all of his impairments, including his substance abuse disorder. However, there are jobs existing in significant numbers in the national economy that Delk could perform if he stopped the substance abuse. R. at 13, 22-24. Therefore, the ALJ concluded that his substance use was a material contributing factor in his disability finding, and thus, Delk would not be disabled within the meaning of the Social Security Act but for his alcohol use. R. at 22-24.

In his motion for summary judgment, Delk challenges the sufficiency of the evidence for the ALJ's conclusion that he would not be disabled but for the substance use. Stemming from

that assertion, Delk further challenges the ALJ's reliance on the VE's opinion, which he contends failed to take into account all of Delk's impairments. (ECF No. 9, at 3).

**B.** **Substantial evidence supports the ALJ's conclusion that without substance abuse, Delk would not have an impairment or combination of impairments which would preclude all work.**

Delk initially contends that "[t]here is nothing in the way of evidence in [the] record by which one can infer sustained chronic abuse of alcohol" and the ALJ's conclusion that Delk would not be disabled absent his substance abuse was "based on nothing more than lay conjecture." (ECF No. 9 at 16, 19). This is a bold argument in the face of Delk's repeated admissions to healthcare providers.   In fact, Delk admits that he is a recovering alcoholic, who "fell off the wagon," and now "quite frankly . . . drinks – a lot." (ECF No. 9 at 2). Moreover, Delk agrees with the Commissioner that "there is a paucity of evidence to demonstrate that Mr. Delk's co-existing depression and anxiety were independently disabling in severity." (ECF No. 12, at 5); see also (ECF No. 11, at 17). Consistent with these admissions, the evidence in the record supports the ALJ's decision that alcohol use was a contributing factor, and without it, Delk would not be disabled.

The ALJ first determined, at step two, that Delk suffered from the severe impairments of depression, anxiety, alcohol

dependence, tachycardia, diverticulosis, and status post colostomy. Id. The ALJ next concluded that though Delk suffered from severe impairments, those impairments did not meet or equal one of the listed impairments with and without consideration of Delk's substance abuse. R. at 13.[10] In the determination of step three, the ALJ noted that no physician had indicated Delk's condition met one of the listed impairments of Appendix One. Id. Delk does not challenge the ALJ's step two or three findings here.

Thus, the ALJ proceeded to evaluate Delk's residual functional capacity (RFC). See R. at 15-22. An assessment of "RFC complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when [the] impairment(s) is severe but neither meets nor is equivalent in severity to a listed mental disorder." 20 C.F.R. § 404, Subpart P, App. 1, 12.00. After considering the entire record, the ALJ concluded that Delk's

---

[10] Delk's mental impairments required the ALJ's assessment according to the "paragraph B" criteria in the appropriate subsection of the Appendix. 20 C.F.R. § 404, Subpart P, App. 1, 12.00. Impairments must result in at least two of the following to satisfy the "paragraph B" criteria: (1) marked restriction[10] of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended period. Id. at 12.04(B). Here, the ALJ determined Delk met none of the "paragraph B" or "paragraph C" criteria. R. at 13-15. The ALJ found no evidence of the "paragraph C" criteria. R. at 15.

impairments, including his substance abuse, would leave him with the residual functional capacity to perform light work defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), with additional limitations, including avoiding unprotected height and machinery, and limiting him to simple repetitive tasks not requiring close interaction with the general public. R. at 15. The ALJ also found that with his substance abuse, he would be unable to sustain concentration and attention for prolonged periods. Id. Absent substance abuse, the ALJ concluded that he would not be limited in concentration and attention, and thus, capable of performing jobs in the national economy.[11] Id. at 22.

In the analysis, the ALJ first reviewed the recent reports in 2012 of medical professionals, including Dr. Richard Shea and Dr. Mebrahtu, who indicated Delk's ability to work was contingent on his mental stability. R. at 17. The ALJ afforded limited weight to these opinions since neither accounted for Delk's substance abuse. R. at 18. For example, Delk denied alcohol abuse to the consultative examiner, Dr. Shea, despite

---

[11] The ALJ's correct application of 20 C.F.R. § 404.1535, see R. at 22-24, distinguishes the ALJ's opinion from that rejected in the Eighth Circuit case relied upon by Delk, Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003. In that case the ALJ wholly failed to cite or apply the SSA's binding regulation on assessing the materiality of alcohol or drug use. Id. at 696. Here, the ALJ correctly applied and cited the regulation, just as the appellate court in Brueggemann described it: he addressed substance use's materiality after making a finding that Delk was disabled based on all of his impairments, after a finding that drugs or alcohol is a concern, and after a finding that substantial evidence in the record shows what limitations would remain in the absence of substance use. Id.

admitting the same only a few days prior in a different evaluation by Dr. Dwiggins. Id. (citing R. at 293, 302). The ALJ applied greater weight to the opinions of the non-examining state agency psychological consultants since they factored Delk's substance abuse disorder in to their finding that Delk was capable of performing simple, routine work. R. at 19 (citing R. at 53-74, 77-98).

Substantial evidence supports the ALJ's assessment of the medical opinions and his finding that Delk's impairments left him with the RFC to perform a range of light work, without limitations in concentration and attention when he discontinued substance use. The ALJ noted the paucity of records for significant mental health problems between 2006 through 2011. R. at 18. The ALJ noted there were two references to anxiety during that time, but Delk reported to never have been on medication. Id. (citing R. at 241, 313). The ALJ also commented on the nature of Delk's alcohol use during this time frame. Id. (citing R. at 236, 238) (showing alcohol-related binges every two to three months in 2010 and a denial of alcohol use in 2011). Furthermore, the ALJ noticed Delk's noncompliance with treatment and continual consumption of alcohol that exacerbated his impairments. Id. (citing R. at 350, 414-23)(noting a deepening depression after drinking for two to three days in February 2010 and psychiatric hospitalization in May 2012 when drinking a

24

gallon of liquor every two days). The common refrain from Delk's treating physicians was the need to decrease or abstain from consumption of alcohol. See R. at 236, 308 (Peter M. Johnson, M.D.); R. at 295 (David Rosin, M.D.); R. at 350 (Abigail Dwiggins, RES); R. at 340 (Robert Harding, M.D.). The ALJ specifically remarked on Delk's period of sobriety and compliance during his psychiatric hospitalization where his symptoms were stable and he was a vocal leader in groups with no apparent anxiety around others. Id. (citing R. at 422). After discharge, the ALJ noted Delk's symptoms worsened but he was also drinking excessively and had been inconsistent in his compliance with medication. Id. (citing R. at 346-65).

The ALJ remarked that Delk "appear[ed] capable of performing simple, repetitive tasks and of performing tasks that do not require close interaction with the general public" even with his substance abuse. R. at 19. The ALJ relied on Delk's report of his daily routine as well as his history of outside activity and interaction with others. Id. (citing R. at 38, 233, 321, 323, 352). Additionally, the ALJ noted Delk's overall positive psychological reports, despite some signs of depression, when he was not in crisis or under the influence of alcohol. Id. (citing R. at 295, 303, 350, 352). Furthermore, no medical source mentioned Delk could not perform light-level work and non-examining state agency consultants determined his

physical impairments were nonsevere. R. at 21 (citing R. at 53-74, 77-98).

When assessing credibility, the ALJ concluded "the claimant's allegations [were] not fully credible when his substance use disorder is not considered, and . . . [found] without his substance use, he can perform light level work and sustain attention and concentration to perform simple and repetitive job tasks, on a regular and continuing basis, with no close interaction with the general public." R. at 22. Importantly here, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Eldeco, Inc. v. N.L.R.B., 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir. 1983)). "Exceptional circumstances" are those where the ALJ's determination is "unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." Id.

Based on the objective medical evidence in the record — namely the continual doctors' recommendation to avoid all alcohol, Delk's noncompliance with that treatment, and evidence of his physical and mental ability to interact outside the home, e.g., playing golf, see R. at 19 — the ALJ concluded that, absent Delk's alcohol abuse and its resulting impact on his

concentration, his RFC allowed him to perform work for which jobs exist in significant numbers in the national economy. Notably, it is the Social Security Administration's "longstanding policy that the claimant continues to have the burden of proving disability throughout the DAA materiality analysis." SSR 13-2p, 78 Fed. Reg. 11939 (Feb. 20, 2013). Review of the record as a whole reveals substantial evidence to support the ALJ's conclusion that Delk did not carry that burden. That is, his conclusion regarding Delk's RFC is supported by sufficient evidence that a reasonable mind would find adequate to support it.

## C.   The ALJ adequately developed the Record.

As mentioned, Delk's counsel appears to recognize the meager evidence of Delk's allegations of mental impairment, but faults the ALJ for failing to develop the record. (ECF No. 9, at 19). Delk's briefing argues that the ALJ based his segregation of the effects of alcohol solely on lay opinion because no medical evidence assesses his abilities separately, to account for the effects of substance abuse. This is incorrect.

"To determine 'whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence.' Where substantial evidence in the record supports the ALJ's finding as to a particular issue, the record is considered to be sufficiently developed." Loving v.

_Astrue_, No. 3:11CV411-HEH, 2012 WL 4329283, at \*5 (E.D. Va. Sept. 20, 2012)(quoting _Anderson v. Astrue_, No. 10-3084, 2011 WL 6130931, at \*2 (W.D. Ark. Oct. 4, 2011))(citing _Mink v. Apfel_, No. 99-2480, 2000 WL 665664, at \*2 (4th Cir. May 22, 2000)). The ALJ's "duty to fully and fairly develop the administrative record" becomes heightened when the claimant is unrepresented and the evidence is inadequate. _Mink v. Apfel_, No. 99-2480, 2000 WL 665664, at \*2 (4th Cir. May 22, 2000). Still, an ALJ has a level of "discretion in determining when a consultative examination will be obtained." _Singleton v. Barnhart_, 399 F. Supp. 2d 686, 690 (D.S.C. 2005).[12]

Here, Delk has an extensive medical record dating from 2008 through the time of the hearing in 2013. In evaluating Delk, the ALJ relied on Delk's numerous visits to the hospital for physical ailments, the documentation of psychiatric visits, and the reports of the state agency physicians. _See_ R. at 11-22. Also, Delk was represented by counsel at the hearing when the ALJ independently questioned Delk. _See_ R. at 29, 32-49. The reason there is little evidence of mental impairment outside of his alcohol dependence is that Delk's considerable medical

---

[12] Delk's assertion that the Commissioner was required to purchase consultive examinations (CE) in order to develop the record, is misplaced. _See_ (ECF No. 9, at 18). According to the SSR cited by Delk, the ALJ _may_ purchase a consultive examination (CE) if the evidence is insufficient, but is _not_ required to do so. SSR 13-2p, at \*11 (emphasis added); _see also_ 20 C.F.R. § 404.1519a(b)(indicating situations where the Commissioner _may_ purchase a CE).

history predominantly featured problems related to his substance abuse rather than his complaints of anxiety and depression. In addition, many of the mental health records begin by identifying Delk's substance abuse and conclude with a primary recommendation that he stop drinking. See, e.g., R. at 294-96. Finally, Dr. Bacani-Longa stated that Delk's "mental health problems are stable with treatment and should continue to improve with substance abuse treatment and sobriety," R. at 86, a finding implicit in numerous other records of Delk's medical treatment. With ample evidence explaining the reason for Delk's problems, an additional consultive exam would serve no purpose and the ALJ was under no obligation to develop the record further.

Thus, the undersigned finds that the ALJ's opinion is supported by substantial evidence because the ALJ's conclusions are logically connected to the ample evidence in the Record.

D.   **The ALJ appropriately elicited testimony from the Vocational Expert.**

Delk also argues that the ALJ's hypothetical question to the vocational expert ("VE") was improper because it allegedly failed to include all of Delk's limitations. (ECF No. 9, at 20). This argument is linked to the ALJ's RFC finding, and Delk's claim that it is not supported by substantial evidence. Id. at 21.

The fifth step in the sequential analysis requires a determination into whether a claimant can perform any other work available in significant numbers in the national economy, considering the claimant's age, education, and past work experience. 20 C.F.R. §§ 404.1566, 416.966. Step five is reached when the claimant is not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings, but nevertheless prevents a claimant from performing past relevant work. See 20 C.F.R. §§ 404.1520 (a)(4), 416.920 (a)(4). In assessing a claimant's ability to perform other work within the economy, the ALJ will look at exertional limitations (those limitations or restrictions which impact only strength activities), as well as non-exertional limitations (those limitations and restrictions which impact non-strength activities such as concentration and ability to follow instructions). 20 C.F.R. §§ 404.1569, 416.969. During this step, the burden of proof shifts to the Commissioner to establish that the claimant has the ability to perform other work. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

If the claimant cannot perform his past relevant work, the ALJ may rely on the testimony of a VE to determine whether jobs that the claimant could perform exist in significant number. The ALJ usually receives such evidence by posing a hypothetical question to the VE. When relying on VE testimony, the

hypotheticals posed must account for all of the claimant's limitations as shown by the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2006) (citing Walker, 889 F.2d at 50). It is erroneous for the ALJ to rely on an errant hypothetical, which failed to consider all limitations shown by the evidence, when forming an opinion about the availability of work suitable to the claimant. See Hancock v. Barnhart, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002). "However, the ALJ need only include in his questioning those impairments which he has found to be credible. If an ALJ does not believe that the claimant suffers from a[n] alleged impairment—and if substantial evidence supports such a conclusion—then the ALJ is not required to include that impairment in questioning the VE." Wilkerson v. Astrue, 7:10-CV-00077-D, 2011 WL 3951165, at *15 (E.D.N.C. Aug. 19, 2011) (citation omitted).

In this case, the ALJ determined that Delk was unable to perform his past relevant work because it exceeded his RFC, even without his substance abuse as a contributing factor. R. at 22. However, the ALJ determined that, excluding limitations related to his substance abuse, Delk had the RFC to perform light work if he avoided unprotected heights and dangerous machinery; and

performed simple, repetitive tasks that did not involve close interactions with the general public. R. at 15. The ALJ determined Delk's inability to sustain concentration and attention for prolonged periods of time resulted from his substance abuse. R. at 15-16. With this RFC determination, the ALJ asked the VE two hypotheticals based on an individual forty-four years old, with a high school education, and work experience as described in the Record. R. at 50-51. In the first hypothetical, the ALJ asked the VE to

> assume that this individual's capable of light exertion []- as it's defined by Social Security regulations, with additional limitations in that the individual should avoid unprotected heights or dangerous machinery.
>
> In addition, the individual[] [woul]d be limited to performing simple, repetitive tasks, and would need to avoid occupations that would require close interaction with the general public. Would there be any jobs such an individual could perform?

R. at 50-51. The VE described jobs including a mail clerk and an office helper. R. at 51. The ALJ posed an additional hypothetical, asking "if, in addition to those limitations posed in the first hypothetical, [the] individual would be unable to sustain concentration and attention for prolonged periods of time, would there be any jobs?" Id. To which the VE replied "No." Id.

The ALJ relied on the VE's answer to the first hypothetical to find jobs existed in the national economy that would

accommodate Delk's limitations. R. at 23. The ALJ's reliance on this answer was based on his conclusion concerning Delk's limitations absent his substance abuse. R. at 23-24. Because that conclusion was supported by substantial evidence, as analyzed above, the undersigned finds no error in the hypothetical posed to the VE.

### V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 10), DENY Delk's Motion for Summary Judgment (ECF No. 8), and AFFIRM the final decision of the Commissioner.

### VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of filing of this Report, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

33

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

April 16, 2015